**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re UPSTART HOLDINGS, INC. DERIVATIVE LITIGATION | Case No. 2:22-cv-02961-ALM-EPD **DEMAND FOR JURY TRIAL** |

<u>**CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiffs William OConnor and Kimberly Chung (collectively, the "Plaintiffs"), by and through their undersigned attorneys, bring this consolidated amended derivative complaint for the benefit of nominal defendant Upstart Holdings, Inc. ("Upstart" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants'[1] breaches of fiduciary duties and violations of federal law.  Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of: (a) documents produced by Upstart pursuant to the Order Granting the Parties' Motion to Consolidate Cases, Appoint Co-Lead Counsel, and Stay the Consolidated Action entered in this case on December 12, 2022 (ECF No. 23) (the "Stipulation of Stay"); (b) public filings made by Upstart with the United States Securities and Exchange Commission ("SEC"); (c) publicly available documents concerning Upstart, transcripts of conference calls with analysts, and

---

[1] The Individual Defendants are Jeff Huber ("Huber"), Kerry Cooper ("Cooper"), Sukhinder Singh Cassidy ("Cassidy"), Hilliard Terry ("Terry"), Mary Hentges ("Hentges"), Ciaran O'Kelly ("O'Kelly"), Dave Girouard ("Girouard"), Paul Gu ("Gu"), Sanjay Datta ("Datta"), Robert Schwartz ("Schwartz") and Anna Counselman ("Counselman") (collectively with the Company, "Defendants").

announcements concerning the Company; (d) press releases issued by, and regarding, Upstart; (e) legal filings, news reports, and securities analysts' reports about the Company; (f) filings in various proceedings, including a federal securities class action captioned *In re Upstart Holdings, Inc. Sec. Litig.*, No. 2:22-cv-02935-ALM-EPD (S.D. Ohio) (the "Securities Class Action"); and (g) other publicly available information concerning Upstart.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Upstart against certain officers and members of the Company's Board for breaches of their fiduciary duties to the Company and its shareholders from at least December 16, 2020 to November 8, 2022 (the "Relevant Period"), as set forth below.

2.      Upstart, founded in 2012, is a financial technology company that uses artificial intelligence ("AI") to underwrite personal loans predominantly to borrowers whose limited or poor credit history generally precludes them from obtaining loans from more traditional sources.

3.      The Company's platform aggregates consumer demand for high-quality loans and connects it to a network of Upstart's AI-enabled bank partners. Upstart claims that its underwriting process enables banking partners to originate loans with higher approval rates and lower loss rates than traditional underwriting processes, while consumers purportedly benefit from higher approval rates and lower interest rates.

4.      The Company's fee-based business model is predicated on moving large volumes of loans through its platform and then placing the loans the Company underwrites with banks or institutional credit investors, thereby keeping loans off its balance sheet and largely insulating itself from credit risk.

5.      As alleged herein, during the Relevant Period the Individual Defendants repeatedly

stated that Upstart's AI-based models could underwrite loans in a way that was superior to traditional underwriting processes and lead to the origination of less risky credit. Upstart touted the predictive capabilities of its AI technology, which would purportedly allow it to handle a recession "far better than a traditional system would." The Company also represented that it would fund a limited amount of loans from its balance sheet only to support the research and development of new loan products, and that it would maintain limited exposure to credit risk.

6.      These and similar statements were materially false and misleading. In reality, the Company's AI-based underwriting model was unable to adequately account for changing macroeconomic conditions, such as rising interest rates, inflation, and changes from government stimulus programs related to the Covid-19 pandemic. As a result, Upstart had been increasingly underwriting progressively less creditworthy loans, requiring the Company to fund a significant amount of loans from its balance sheet to support loan transaction volume and stabilize its business, thereby exposing Upstart to significant credit risk.

7.      On December 9, 2020, Upstart filed its registration statement and prospectus (the "Registration Statement") with the SEC in connection with the Company's initial public offering ("IPO"). On December 16, 2020, Upstart completed its IPO, taking advantage of the thriving lending market created by the U.S. government's stimulus programs during the COVID-19 pandemic. Upstart completed a successful IPO, offering approximately nine million shares to the public at $20.00 per share.

8.      The Individual Defendants' misrepresentations of the Company's business model, including the promises of loans with low credit risk and the unique position of the Company to withstand macroeconomic changes, were material to investors. As a result of the Individual Defendants' misrepresentations during the Relevant Period, detailed herein, Upstart securities

traded at artificially inflated prices. In the year following the IPO, Upstart's stock price skyrocketed, reaching a high of $401.49 on October 15, 2021.

9.     However, the truth was revealed on May 9, 2022, when the Company announced its financial results for the first quarter of 2022. Upstart reported that it held approximately $604 million worth of loans, notes, residuals on its balance sheet, an amount significantly higher than previous periods and more than double the $261 million that it held at the end of the previous quarter. The Company acknowledged that the significant increase in the amount of loans retained on its balance sheet was the result of rising "default rates" on loans originated in the second half of 2021 as well as "rising interest rates and rising consumer delinquencies putting downward pressure on conversion." Further, Upstart revealed that, though the Company had historically used its balance sheet "almost exclusively" for the research and development of new loan products, in the first quarter of 2022, Upstart used its balance sheet as "a market-clearing mechanism" to support the Company's loan transaction volume and stabilize its business.

10.     The Company also confirmed that it had recently "loosened" its loan modification policy to make it easier for Upstart borrowers to obtain forbearance of their loan payments. This had the effect of converting the status of "delinquent" loans to "current," and likely masked the true extent of delinquent Upstart loans. In response, Upstart cut its 2022 revenue guidance by $150 million and issued revenue guidance for the second quarter of 2022 that was well below analyst expectations. Despite Upstart's prior statements touting its ability to handle a recession "far better than a traditional system would," the Company attributed its weak outlook to "macro uncertainties" and "the prospect of a recession."

11.     On this news, the Company's share price fell $43.52, or over 56%, from a closing price of $77.13 per share on May 9, 2022, to a closing price of $33.61 per share on May 10, 2022.

Additionally, the price of Upstart's Convertible Senior Notes declined by $13.37, or approximately 18.2%, based on a comparison of the last trade price on May 9, 2022 before the Company's disclosures and the last trade price on May 10, 2022.

12. Then, on July 7, 2022, the Company announced its preliminary unaudited financial results for the second quarter of 2022, revealing that its revenue was expected to be approximately $228 million, a significant decrease from the previously estimated $295 to $305 million. Defendant Girouard stated that:

> Our revenue was negatively impacted by two factors approximately equally. First, our marketplace is funding constrained, largely driven by concerns about the macroeconomy among lenders and capital market participants. Second, in Q2, we took action to convert loans on our balance sheet into cash, which, given the quickly increasing rate environment, negatively impacted our revenue.

13. On this news, the Company's stock price decreased $6.65 per share, or approximately 20%, to close at $27.09 per share on July 8, 2022.

14. The truth was fully revealed on November 8, 2022, when the Company announced its financial results for the third quarter of 2022, revealing that total revenue was $157 million, a decrease of 31% from the third quarter of 2021. Defendant Datta stated that Upstart-originated loans were experiencing 25% more losses than modeled, essentially admitting that the Company's AI model was not performing well in the same macroeconomic environment that the Company previously told investors that the model was designed to perform.

15. On this news, the Company's stock price dropped $1.98 per share, or approximately 10%, to close at $17.06 per share on November 9, 2022.

16. As a result of the foregoing, the Securities Class Action was filed against Upstart and Defendants Girouard, Datta, Gu, and Counselman.

17. On September 29, 2023 this Court denied the defendants' motion to dismiss in the

Security Class Action in part (ECF No. 68) (the "Securities Class Action MTD Order"). Among other things, the Court found that "[t]he suspiciously timed insider sales, the disregard for the most current factual information, and the fact that the challenged statements go to the core of Upstart's business model and were intended to reassure investors all point in favor of a strong inference of actual knowledge" and that "the following statements by the Upstart Defendants [were] actionable: (1) specific, material, and verifiable statements about the superiority of Upstart's AI underwriting model over traditional, FICO-based models; (2) statements about the AI model's ability to adapt to quickly changing macroeconomic conditions and its rate-insensitivity." Securities Class Action MTD Order at 48.

18.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the costs of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

19.     Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act. Demand is excused as to each of the Director Defendants (defined below) because each faces a substantial likelihood of liability for the misconduct alleged herein.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78aa(a), over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section

21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

21.    Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

24.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Upstart maintains its largest office, one of is two headquarters ("HQ2"), in this District and conducts business in this District.

## PARTIES

*Plaintiffs*

26.    Plaintiff William OConnor is, and has been at all relevant times, a shareholder of Upstart.

27.    Plaintiff Kimberly Chung is, and has been at all relevant times, a shareholder of Upstart.

*Nominal Defendant*

28.    Nominal Defendant Upstart is incorporated under the laws of Delaware with its principal executive offices located in Columbus, Ohio. Upstart's common stock trades on the NASDAQ under the ticker symbol "UPST."

*Individual Defendants*

7

29.     Defendant Huber has served as a director of the Company since June 2021. Huber also serves as a member of the Board's Nominating and Corporate Governance Committee. According to the Company's public filings, Huber received $170,708 in 2021 in compensation from the Company.

30.     Defendant Cooper has served as a director of the Company since March 2021. Cooper also serves as Chairperson of the Board's Compensation Committee. According to the Company's public filings, Cooper received $221,817 in 2021 in compensation from the Company.

31.     Defendant Cassidy has served as a director of the Company since February 2020. Cassidy also serves as a member of the Board's Compensation Committee. According to the Company's public filings, Cassidy received $317,744 in 2021 in compensation from the Company. On November 19, 2021, Cassidy sold 5,000 shares of the Company's stock for proceeds of over $1.05 million.

32.     Defendant Terry has served as a director of the Company since February 2019. Terry also serves as Chairperson of the Board's Audit Committee. According to the Company's public filings, Terry received $298,744 in 2021 in compensation from the Company. On November 11, 2021, Terry sold 60,000 shares of the Company's stock for proceeds of over $16.06 million.

33.     Defendant Hentges has served as a director of the Company since December 2019. Hentges also serves as a member of the Board's Audit Committee. According to the Company's public filings, Hentges received $288,744 in 2021 in compensation from the Company. On November 15, 2021, Hentges sold 30,000 shares of the Company's stock for proceeds of over $7.37 million.

34.     Defendant O'Kelly has served as a director of the Company since April 2018. O'Kelly also serves as Chairperson of the Board's Nominating and Corporate Governance

Committee and a member of the Audit Committee. According to the Company's public filings, O'Kelly received $296,744 in 2021 in compensation from the Company.

35.     Defendant Girouard is co-founder and Chief Executive Officer ("CEO") of the Company and has served as a director since its inception in 2012. According to the Company's public filings, Girouard received $14,955,933 in 2021 in compensation from the Company. Girouard is named as a defendant in the Securities Class Action. Girouard also serves as the trustee of the 2008 D&T Girouard Revocable Trust (the "Girouard Revocable Trust"). Between August 2021 and March 2022, Girouard, directly and through the Girouard Revocable Trust, sold over 1.15 million shares of the Company's stock for proceeds of over $207.59 million.

36.     Defendant Gu is a co-founder of the Company, its Senior Vice President of Product and Data Science, and has served as a director since April 2015. According to the Company's public filings, Gu received $7,925,248 in 2021 in compensation from the Company. Gu is named as a defendant in the Securities Class Action. Between August 2021 and March 2022, Gu sold 506,000 shares of the Company's stock for proceeds of over $143.63 million.

37.     Defendant Datta has served as the Company's Chief Financial Officer ("CFO") since December 2016. According to the Company's public filings, Datta received $7,925,248 in 2021 in compensation from the Company. Datta is named as a defendant in the Securities Class Action.

38.     Defendant Counselman is co-founder of the Company. Counselman has served in various roles at the Company since 2012 and currently serves as the Company's Senior Vice of Business Operations. During the Relevant Period, Counselman served as Senior Vice President of People and Operations. According to the Company's public filings, Counselman received $4,022,054 in 2021 in compensation from the Company. Counselman is named as a defendant in

the Securities Class Action. On August 19, 2021, Counselman sold 608,355 shares of the Company's stock for proceeds of over $122 million.

39. Defendant Schwartz served as a Company director from June 2015 until his resignation on November 15, 2021. He declined to receive compensation, including equity awards, for his service as a director.

40. Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu are herein referred to as the "Director Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41. By reason of their positions as officers and/or directors of Upstart, and because of their ability to control the business and corporate affairs of Upstart, the Individual Defendants owed Upstart and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Upstart in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Upstart and its shareholders so as to benefit all shareholders equally.

42. Each director and officer of the Company owes to Upstart and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

43. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Upstart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44. To discharge their duties, the officers and directors of Upstart were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Upstart, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

46.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

47.     To discharge their duties, the officers and directors of Upstart were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Upstart were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Upstart's own Code of Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Upstart conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Upstart and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Upstart's operations would comply with all applicable laws and Upstart's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.     Each of the Individual Defendants further owed to Upstart and the shareholders the duty of loyalty requiring that each favor Upstart's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

49.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Upstart and were at all times acting within the course and scope of such agency.

50.     Because of their advisory, executive, managerial, and directorial positions with Upstart, each of the Individual Defendants had access to adverse, non-public information about the Company.

51.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Upstart.

## UPSTART'S CODE OF BUSINESS CONDUCT AND ETHICS

52.     Upstart's Code of Ethics applies to all directors, officers and employees (referred to jointly as "employees") and is intended to reflect the Company's business practices and principles of behavior in support of its commitment to "maintaining the highest standards of ethical conduct."

53.     The Company expects every employee, contractor, and consultant to read and understand the Code of Ethics and its application to the performance of his or her business responsibilities. Employees who violate the Code of Ethics are subject to disciplinary action, up

to and including termination.

54.     In a section titled "Compliance With Laws, Rules and Regulations," the Code of

Ethics states, in relevant part:

> All employees must respect and obey all laws when carrying out responsibilities on behalf of the Company and refrain from illegal conduct. Employees have an obligation to be knowledgeable about specific laws, rules and regulations that apply to their areas of responsibility. If a law conflicts with a policy in this Code, employees must comply with the law. Any questions as to the applicability of any law should be directed to the Responsible Officer.

> The following is a brief summary of certain topics about which employees should be aware:

*               *               *

> E. <u>Insider Trading</u>. Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material non-public information about that company. Because employees will have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material nonpublic information, trading in the Company's securities or in the securities of those companies with which the Company does business by employees or persons employees provide material nonpublic information to could constitute insider trading, violating the law. It is an employee's responsibility to comply with these laws and not to share material nonpublic information. Please see the Company's Insider Trading Policy for more information about our policies and procedures relating to insider trading.

55.     In a section titled "Keeping the Audit Committee Informed," the Code of Ethics

states:

> The Audit Committee plays an important role in ensuring the integrity of the Company's public reports. If an employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should notify the Audit Committee of the Board. In particular, any employee should promptly bring to the attention of the Audit Committee any information of which they may become aware concerning:

> a.   the accuracy of material disclosures made by the Company in its public filings;

> b.   material weaknesses or significant deficiencies in internal control over financial reporting;

> c.   any evidence of fraud that involves an employee who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or

14

    d.   any evidence of a material violation of the policies in this Code regarding financial reporting.

56.    In a section titled "Reporting and Other Records," the Code of ethics states, in relevant part:

> As a financial services company, it is of critical importance that the Company's reporting to the various regulators with oversight over our business, and to our partners, be full, fair, accurate, timely and understandable. Depending on their respective positions with the Company, employees may be called upon to provide information necessary to assure that the Company's reporting meet these requirements. The Company expects employees to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's reporting requirements.

> Employees are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.

> Each employee involved in the Company's disclosure process must familiarize themselves with the disclosure requirements applicable to the Company and the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

## UPSTART'S AUDIT COMMITTEE CHARTER

57.    Upstart's Audit Committee Charter, amended on November 11, 2021, states that the purpose of the Audit Committee is to assist the Board in its oversight of:

1. the accounting and financial reporting processes and internal controls of the Company;

2. the audit and integrity of the Company's financial statements;

3. the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

4. the qualifications, independence and performance of the Company's independent auditors; and

5. the design, implementation and performance of the Company's internal audit function, as applicable.

Following the Company's initial public offering, the Committee shall also be responsible for preparing the report required by the Securities and Exchange Commission (the "SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing other duties and responsibilities as are enumerated in or consistent with this charter.

58. In a section detailing the Audit Committee's responsibilities with respect to "Review of Internal Controls and Integrity of Financial Statements," the Audit Committee Charter states, in relevant part:

The Committee shall meet with management, the internal audit department, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:

    a. the scope and timing of the annual audit of the Company's financial statements;

    b. the Company's annual audited and quarterly unaudited financial statements and following the Company's initial public offering, annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; if applicable, the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

    c. the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

    d. the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

    e. the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

    f. any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

    g. any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

  h. any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

  i. any other material written communications between the independent auditor and management, including, but not limited to, the management letter and schedule of unadjusted differences;

  j. the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

  k. any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

59. In a section detailing the Audit Committee's responsibilities with respect to "Review of Financial Information Presentation, Earnings Press Releases and Guidance," the Audit Committee Charter states:

> The Committee shall periodically discuss with management the Company's procedures with respect to the presentation of the Company's financial information (paying attention to any use of "pro forma" or "adjusted" non-GAAP information) and review earnings press releases, earnings guidance provided to analysts and rating agencies and financial information provided to the public, analysts and ratings agencies.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii)

17

conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

62.　　The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

63.　　Each of the Individual Defendants aided, abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.　　At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Upstart and was at all times acting within the course and scope of such agency.

## **SUBSTANTIVE ALLEGATIONS**

### *Background*

65.　　Founded in 2012, Upstart purports to leverage the power of AI to more accurately quantify the true risk of a loan by targeting fee optimization, income fraud, acquisition targeting, loan stacking, prepayment prediction, identity fraud and time-delimited default prediction. The

Company aims to enable lenders to approve more loans with fewer defaults than traditional underwriting processes.

66.    The Company went public through an IPO on December 16, 2020. Upstart offered approximately nine million shares to the public at $20.00 per share.

67.    Through its online lending marketplace, the Company partners with banks and credit unions to provide personal and auto loans ranging from $1,000 to $50,000, at annual percentage rates typically ranging from 6.5% to 35.99% over three to seven years. The Company's AI models utilizes non-conventional sources of risk quantification, such as education and employment, to assess default risk, and look beyond the traditional FICO-based lending model.

68.    Upstart's revenue is primarily comprised of fees paid by banks. Specifically, the Company charges banks referral fees for each loan referred through its website and originated by a bank partner, platform fees for each loan originated, regardless of its source, and loan servicing fees as consumers repay their loans.

69.    Loans underwritten by Upstart, referred to as "Upstart-powered loans," are either: (1) retained by its originating bank partner; (2) distributed to the Company's base of institutional investors and buyers that invest in Upstart-powered loans; or (3) in some instances, funded by Upstart's balance sheet. For the year ended December 31, 2021, 16% of the loans funded through the Company's platform were retained by the originating bank, while 80% of loans were purchased by institutional investors through the Company's loan funding programs. Upstart seeks to place all loans with banks or institutional investors, thereby keeping loans off its balance sheet and limiting its exposure to credit risk. The Company maintains that it generally holds loans on its balance sheet until it can contribute them into term securitization transactions or otherwise liquidate them, only occasionally holding some loans on its balance sheet indefinitely. The Company's fee-based

business model, as well as its ability to improve its machine learning algorithms, depends on its ability to increase loan volumes.

***The Individual Defendants' False and Misleading Statements***

70.     As detailed below, the Individual Defendants made numerous materially false and misleading statements throughout the Relevant Period, repeatedly touting Upstart's "unique" lending platform and the financial success associated therewith. Specifically, the Individual Defendants repeatedly emphasized Upstart's ability to handle macroeconomic changes quickly and effectively.

71.     However, these statements were materially false and misleading because, in reality, the Individual Defendants knew that Upstart's platform would be unable to adapt to changing macroeconomic circumstances, and even anticipated and planned for a change in business when interest rates rose post-Covid.

72.     On December 9, 2020, the Company filed the Registration Statement with the SEC in connection with the Company's IPO to be held on December 16, 2020. The Registration Statement stated the following about Upstart's AI capabilities:

> [***W]ith an AI-based system, banks can lend responsibly in any environment, with a system that responds quickly and intelligently to changes in employment levels and economic output***. This isn't just theory: during the employment shock of the recent COVID-19 pandemic, unemployment increased from about 4% to 14% in just a few weeks. While this led to a temporary decrease in loan originations and in the availability of loan funding as well as a potential for increased losses, ***Upstart partner banks experienced immaterial impact to the performance of their loans.*** [2]

73.     On March 17, 2021, the Company hosted an earnings call with investors and analysts in connection with its fiscal fourth quarter and fiscal year 2020 results. During the call, Defendant Girouard, the Company's co-founder and CEO, explained that "Upstart is a fee-based

---

[2] Emphasis is added unless otherwise noted.

business" that "do[es not] make loans," and assured investors that "we aren't exposed to material balance sheet risk." Girouard touted the ability of Upstart's AI model to target default risk as "the centerpiece of our system" because "[i]t predicts not just the likelihood that a loan will default, but when that default can be expected to happen" thereby offering advantages to the Company's lending partners in the form of "higher approval rates, lower loss rates and a highly automated digital experience" and "enables lending programs that are more predictable, more profitable, and more inclusive."

74.     Also during the call, Defendant Datta, the Company's CFO, stated that Upstart carried an aggregate balance of loans, notes, and residuals of $98 million on its balance sheet at the end of 2020, down from $266 million at the end of 2019, purportedly reflecting the Company's "continued reduction in the percentage of platform loans funded through [Upstart's] balance sheet." In response to an analyst's question about securitizations of loans underwritten by Upstart, Datta represented that the Company's pipeline "is as good as it's ever been with respect to demand for loans on the funding side" and "funding has not been an obstacle to [the Company's financial results] in any way."

75.     On March 18, 2021, the Company filed its annual report for the fiscal year 2020 on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K touted the Company's ability to adapt, stating that the AI model "changes in real time" and was "constantly improving."

76.     The 2020 10-K also went on to discuss how Upstart's success would go beyond the Covid-19 pandemic, stating that "[a]lthough significant government assistance was provided during the COVID-19 pandemic, the resilience of our bank partner results during this time provides evidence of the benefits that our AI models can offer to bank lending programs. We believe these benefits are even more compelling and valuable during periods of economic downturn."

77.    However, these statements were materially false and misleading because the Individual Defendants knew that the AI platform was not as adaptable as they were making it out to be and that it would be unable to adapt to changing macroeconomic circumstances, including the end of the Covid-19 pandemic.

78.    On April 6, 2021, the Company held a secondary public offering ("SPO"). In connection with the SPO, Upstart filed a registration statement (the "SPO Registration Statement"). The SPO Registration Statement maintained that the Company's "constantly improving AI models provide a significant competitive advantage" because "more training data leads to higher approval rates and lower interest rates at the same loss rate." The SPO Registration Statement further maintained that the AI model improved in "real time" and was therefore responsive to macroeconomic changes. The SPO Registration Statement also stated that Upstart's methods were superior to traditional FICO score-centered methods of credit checking:

> The FICO score was invented in 1989 and has not fundamentally changed since that time. The FICO score is used by over 90% of lenders to determine who is approved for credit and at what interest rate. While FICO is rarely used in isolation, many credit models are simple rules-based systems. A leading expert found that bank credit models commonly incorporate eight to 15 variables, with the more sophisticated models using as many as 30. Unsurprisingly, the world is more complicated than can be represented by these models, so they are limited in their ability to reliably estimate the probability of default.

79.    On May 4, 2021, a Company executive, Jeff Keltner, interviewed Defendant Gu on the Leaders in Lending podcast. During the podcast, Keltner asked Defendant Gu, "[h]ow do you think about what happened during I mean the last 12 months have been kind of unprecedented time both from a macroeconomic environment point of view and an unemployment potentially fraud drivers view, how have you thought about your models' ability to perform through this kind of unprecedented economic experience kind of disruption to daily life and what are the results you've seen?" Defendant Gu responded:

So now going back to this past year of course with sort of a very interesting time not only was a turn in the economic cycle but a very unusual one and essentially what we saw was that we saw certainly a lot of changes to consumer behavior but in aggregate we actually saw the sort of loan performance of the sort of entire ecosystem across all our bank partners all our sort of capital markets partners the returns that they were expecting to earn they pretty much across the board consistently achieved or beat over the course of the last year in spite of the pandemic. ***Now having said that I think a lot of that does have to do with some of the sort of unique circumstances that happen here which is another piece of what we sort of really built into our model and that's about being able to respond to the sort of macroeconomic changes on really a dime***. I mean when unemployment rates started going up in Q2 2020 that was a time where it was really important to do those very quickly and precisely to the sort of changes in unemployment rates and you want them to be able to tell like which sectors, occupations, etc. there was extra unemployment risks that you needed to be modeling in and how to model it relative to traditional norms. And you wanted your model to handle that because the alternative was sort of getting a group of people to sit around a table and kind of like do some back-of-the-envelope math and then sort of perhaps a like take a blunt cut to your credit box and that sort just means that you're either going to still take on too much risk or you're going to essentially stop running your business during this challenging time. Well what we found was we were able to continue approving a significant number of people for loans and have those people pay back because they were the right people to lend to. ***On the sort of reverse side as things started normalizing again you want that system that can respond very dynamically to update macroeconomic data and that's sort of a system that we built and it sort of worked incredibly well over the last year.***

80.     On May 11, 2021, Upstart announced its financial results for the first quarter of 2021 and hosted an earnings call with analysts and investors.  During the earnings call, Girouard assured investors that the Company's rapid growth was sustainable because it is "primarily technology and model-driven, which manifests as increasing conversion rates in our borrower funnel." Datta then highlighted that the Company's aggregate balance of loans, notes, and residuals had decreased to $73.2 million from $227.5 million at the end of the same quarter in the prior year, and reassured investors of Upstart's trend of a "continuing reduction in the percentage of platform loans funded through our own balance sheet." Girouard also touted various upgrades that Upstart had made to its AI models during the quarter, stating that "[t]his upgrade led to higher approval rates and lower interest rates which, of course, translates into more loans." In response to an

analyst's question about how the model upgrades translated into higher conversion rates for the Company, Girouard explained that Upstart's model "gets smarter about separating good credits from bad credits" and "[i]t thereby helps us avoid offering loans to those who are more likely to default and the effect of that, which is the most basic sort of building block of our business, is that it allows us to approve more people at generally lower rates."

81.     However, the Individual Defendants knew that the financial success of the Company and the success of the AI platform were unsustainable. ███████████████



82.     ████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

83.     The Individual Defendants continued to misrepresent the success of the Company's AI platform. On June 9, 2021, during the Bank of America Global Technology Conference, Girouard represented that because Upstart's "revenue is almost entirely fees paid to [the Company] by banks not subject to claw-backs," the Company's ability to generate revenue is not "anything related to quality of credit performance." In response to an analyst's question about how Upstart

would be able to respond to a credit cycle, Girouard represented that "[c]redit quality is the sort of true north of the company" and Upstart's model will handle "disruptions in the economy" and a "recession far better than a traditional system would" because "[i]t can very quickly adjust itself to handle the macro situation that is evolving out there." Furthermore, Girouard contended that Upstart had "a great proof point that a model like ours actually can handle disruptions in the economy and dislocations better than a standard model."

84. Additionally, on August 10, 2021, the Company announced its financial results for the second quarter of 2021. During the Company's earnings call with analysts that day, Defendant Girouard touted that Upstart's "more powerful algorithms and growth in training data led to a boost in approval rate and a more accurate system overall" and "continued to drive separation between our AI-powered platform and more conventional lending systems."

85. During the August 10, 2021, earnings call, Datta discussed the state of the Company's balance sheet, stating that, "[i]n terms of loan assets, [Upstart] carried an aggregate balance of loans, notes, and residuals of $95.3 million," up from $73.2 million in the first quarter of 2021, but down from $148 million at the end of the same quarter in the previous year. Datta reassured investors that "these loan assets represent the totality of the direct exposure we have to credit risk."

86.

25

87.     On September 9, 2021, Defendant Girouard attended the Deutsche Bank Technology Conference. At the conference, Girouard touted the application of Upstart's AI-based technology as "a Holy Grail of credit and lending," stating that the Company was "developing models for credit origination that are more accurately measuring risk than the legacy systems, which tend to be FICO centric" and are therefore "able to approve more borrowers at lower rates and actually, lower loss rates." Regarding Upstart's exposure to credit risk, Girouard again assured investors that "we don't take risk in the loans" because "we aren't in any sense a lender ourselves," but rather "[w]e provide a toolset to banks to originate credit and charge them fees to use it." Further, in response to an analyst's question about the competitive advantages of Upstart's platform, Girouard presented the Company's "product that can approve more borrowers at lower loss rates" as "a fairly magical thing" because its "AI-based system is [ ] always getting better" and "we're getting more sophisticated AI as we go and our model is inevitably getting more accurate as time goes by."

88.     On November 9, 2021, Upstart announced its financial results for the third quarter of 2021 and hosted an earnings call with analysts and investors. During the earnings call, Datta noted that the aggregate balance of loans, notes, and residuals on the Company's balance sheet had increased to $140 million, up from $95.3 million in the previous quarter, but still down from $145 million at the end of the same quarter the previous year. Datta claimed that the reason the "dollar volume of loans we carry is edging upwards" was the Company's "use [of] our balance sheet to support the scaling of our growing auto product, as well as our expansion into the lower credit score segments of personal lending." In response to an analyst question about demand to fund Upstart-powered loans, Girouard represented that the Company would remain largely insulated from credit risk by quickly placing loans with its partners because Upstart has "[a] lot of banks

who are originating loans for their own balance sheets" as well as "banks that are selling through to 100-plus, 150-plus capital markets, partners," creating a "very liquid environment." Datta assured investors that "even when we're past the current . . . distortion in the market, we'll be in pretty good shape with respect to demand."

89.     On November 10, 2021, Defendant Girouard appeared on CNBC's Closing Bell. During the interview, Defendant Girouard was asked how the stimulus and incoming higher interest rates would affect the Company. Defendant Girouard responded:

> Yeah I mean you know independent of us certainly consumers being overweighed in credit is a bad thing but clearly on the macro sense the consumer has not been healthier so from that sense for sure the consumer is in great shape due to stimulus, due to lower spending during the pandemic that's all true. ***The core of what we do though is more accurate risk models. It really is independent of the macro cycle though certainly it considers the cycle and when you can more accurately separate good risk from bad risk you can suddenly begin to offer better rates and more approvals to people that are credit worthy that will pay back a loan. So it's really in some sense unique.*** It's not, it's independent of the where we are in the cycle. Though importantly it actually is helpful for banks to navigate a complicated cycle like we saw in the last couple years particularly with the pandemic.
>
> Yeah I think we're just seeing a reemergence of a demand for credit because consumer spending is going up, credit balances, you know BNPL is great but in the end it ends up with consumers having more debt and spending more which is you know the primary sort of offer to the merchant in BNPL is that consumers will spend more. ***Well guess what that ends up eventually in people being a bit over their ski so you know I think this is all part of what our system is designed to work well with and we're somewhat of a rate agnostic system. As interest rates go up our system adjusts to that but we're not overly rate sensitive like you might see elsewhere.***

90.     These statements were materially false and misleading. The Individual Defendants knew that they could not predict that the Company would be in "pretty good shape" due to the uncertainties post-Covid-19. ██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████████



91.

92.     Despite this, the Individual Defendants continued to mislead the public. On February 15, 2022, Upstart reported financial results for the fourth quarter and full year ended December 31, 2021. During the Company's earnings call with analysts that day, Datta assured investors that while the Company was "cognizant of the fluidity in the macro environment," it was "not expecting any meaningful adverse impact from rising defaults on our volumes or economics" because "[i]t's not . . . a longer term . . . increase in default profile." Datta reported that the balance of loans, notes, and residuals on the Company's balance sheet had skyrocketed to $261 million, up from $140 million in the previous quarter, and claimed that the increase "reflect[ed] the accelerated pace of [research and development]" and was the result of the Company's reinvestment of $170 million "in the form of loans made in support of new [research and development] programs." Despite the increase in loans retained on the Company's balance sheet, Upstart reported to investors that it expected to generate revenue of $1.4 billion in 2022. Defendant Datta also stated

the following about why Upstart's balance sheet was increasingly filled with loans:

> $170 million was reinvested back into our balance sheet in the form of loans made *in support of new R&D programs*. Consequently, our balance of loans, notes and residuals at the end of the year was $261 million, up from $140 million in Q3 and *reflecting the accelerated pace of R&D*. Most notably, *auto lending has been funded since inception entirely from our own balance sheet. This is, as always, a temporary incubation period* until we reach the point where the loans can be directed to our bank partners and institutional investors at reasonable scale, which we anticipate will begin to happen next quarter.

93.    Datta further stated that despite the practice of Upstart putting loans on the

Company's balance sheet was "obviously not our core model," he told investors and analysts that

the Company would pivot back to its "core business model" soon:

> So currently, we're earning net interest income off of those loans, which is obviously not our core model. At some point, those loans will start to make their way to banks and investors. As I said in the prior remarks, *we anticipate that happening over the next quarter or so.* And when that happens, *we'll begin to pivot to a fee model that's more akin to our core business model*, but that's still in front of us.

94.    On February 18, 2022, the Company filed its annual report for the fiscal year 2021

on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K touted the Company's ability to

adapt, stating that the AI model "changes in real time." The 2021 10-K also stated the following:

> We leverage the power of AI to more accurately quantify the true risk of a loan. Our AI models have been continuously upgraded, trained and refined for more than eight years. We have discrete AI models that target fee optimization, income fraud, acquisition targeting, loan stacking, prepayment prediction, identity fraud and time-delimited default prediction. Our models incorporate more than 1,500 variables and benefit from a rapidly growing training dataset that currently contains more than 21.6 million repayment events. *The network effects generated by our constantly improving AI models provide a significant competitive advantage –* more training data leads to higher approval rates and lower interest rates at the same loss rate.

95.    Internally, however, the Individual Defendants were aware that Upstart's platform

was not really immune to macroeconomic changes, including the credit changes post-Covid-19.



96.     On March 9, 2022, during the Morgan Stanley Media and Telecom Conference, Girouard touted the Company's ability to successfully navigate a downturn in the economy. Specifically, Girouard stated that "volatility and turbulence . . . is an environment that we shine in" and "more noise, more volatility ends up being a good thing for us as a company because we can handle it, manage it better than others," particularly since "we're a very lightweight company" with a "small balance sheet." Girouard then assured investors that "we're a company that thrives in this type of environment and we will, without question, come out stronger on the other side."

97.     The above statements about Upstart's limited exposure to credit risk and business, operations, and prospects, including its 2022 guidance, were materially false and/or misleading. In truth, Upstart's AI-based underwriting model could not adequately account for macroeconomic factors such as rising interest rates and inflation, nor the expiration of the U.S. government stimulus related to the COVID-19 pandemic. As a result, the Company had been increasingly underwriting

progressively less creditworthy loans. Weakening delinquency and default trends on Upstart-powered loans caused demand from credit investors and the securitization market to decline, which negatively impacted Upstart's conversion rate. Consequently, Upstart's use of its balance sheet to fund loans and support volume rendered the Company significantly more exposed to credit risk.

98. On April 5, 2022, Upstart filed the 2022 Proxy Statement on Schedule 14A with the SEC. Defendants Huber, Cooper, Cassidy, Terry, Hentges, Schwartz, O'Kelly, Girouard, and Gu solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

99. The 2022 Proxy Statement called for Company shareholders to, *inter alia*: (1) reelect Defendants Cassidy and Gu to serve staggered terms on the Board; (2) ratify the appointment of Deloitte & Touche LLP as the Company's registered public accounting firm; (3) approve, on an advisory basis, the frequency of future stockholder advisory votes on the compensation of the Company's named executive officers; and (4) transact such other business as may properly come before the meeting.

100. The 2022 Proxy Statement also detailed the principal functions of the Audit Committee, which at that time consisted of Defendants Terry, Hentges, and O'Kelly. These functions included the following:

- Selecting a qualified firm for accounting purposes to audit the Company's financial statements;

- Help to ensure the independence and performance of the public accounting firm;

- Discuss the scope and results of the audit with the public accounting firm, and review with management and independent public accounting firm, the Company's interim and year-end results of operation;

- Develop procedures for employees to submit concerns anonymously about question accounting or audit matters;

- Review the Company's polices on risk assessment and risk management;

- Review related party transactions; and

- Approve, or pre-approve, all audit and permissible non-audit services to be performed by the independent public accounting firm.

101.    Additionally, under the heading entitled "Role of our Board in Risk Oversight," the

2022 Proxy Statement stated the following:

> We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day oversight and management of strategic, operational, legal and regulatory compliance, cybersecurity, and financial risks, while our Board, as a whole and assisted by its committees, has responsibility for the oversight of our risk management framework, which is designed to identify, assess, and manage risks to which our company is exposed. Consistent with this approach, our Board regularly reviews our strategic and operational risks in the context of discussions with management, question and answer sessions, and reports from the management team at each regular board meeting. Our board also receives regular reports on all significant committee activities at each regular board meeting and evaluates the risks inherent in significant transactions.

102.    The 2022 Proxy Statement, in the same section, also outlined the responsibilities

and obligations of the Board's committees in respect to risk management and oversight:

> In addition, our Board has tasked designated standing committees with oversight of certain categories of risk management. Our audit committee assists our board in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, as well as legal and regulatory compliance and potential conflicts of interest. The audit committee also oversees our enterprise-risk management program, as well as our initiatives related to cybersecurity. Further, our audit committee, among other things, discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our compensation committee assesses risks relating to our executive compensation plans and arrangements. Our nominating and corporate governance committee assesses risks relating to our corporate governance practices and the independence of the board. Our Board believes its current leadership structure supports the risk oversight function of the board.

103.    The 2022 Proxy Statement further stated that the Company has a "competitive

advantage" because of its accurate "AI models."

32

104. The above statements in the 2022 Proxy Statement were false and misleading because they failed to disclose that: (1) contrary to the 2022 Proxy Statement's description of Upstart's Audit Committee's responsibilities, Upstart's Audit Committee was not adequately exercising these functions, was causing or permitting Upstart to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the 2022 Proxy Statement; and (3) contrary to the 2022 Proxy Statement's description regarding the risk oversight function of the Board, the Board would utterly fail in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties.

105. The above statements in the 2022 Proxy Statement were false and misleading because they also failed to disclose that (1) Upstart's AI software was incapable of considering several relevant and important factors in determining loan creditworthiness; (2) as a result, Upstart faced harmful effects on its conversion rate; (3) as a result, Upstart would increasingly rely on its balance sheet to fund loans; (4) due to the foregoing, the Individual Defendants misrepresented the Company's true capabilities in approving and executing loans; and (6) the Company failed to maintain internal controls. As a result of the foregoing, these statements concerning the Company's business and financial prospects were materially false and misleading when made.

106. As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders: (1) reelected Defendants Cassidy and Gu to the Board, which allowed them to breach their fiduciary duties to the Company; and (2) approved, on an advisory basis, the frequency of future stockholder advisory votes on the compensation of named executive

officers based on materially false and misleading statements regarding the Company's business and financial prospects.

***The Truth Emerges***

107.    The truth began to emerge on May 9, 2022, when Upstart announced its financial results for the first quarter of 2022. The Company revealed that the balance of loans, notes, and residuals held on the Company's balance sheet had more than doubled in just one quarter, from approximately $261 million for the period ended December 31, 2021, to more than $604 million for the period ended March 31, 2022.

108.    During the Company's earnings call with analysts and investors held that day, Girouard admitted that Upstart "observed more volatility" for loans funded by institutional investors and capital markets participants, which he attributed to "the abrupt termination of [COVID-19-related government stimulus] programs [which] caused some of the more recent vintages to underperform." Datta acknowledged that the significant increase in the amount of loans retained on the Company's balance sheet was the result of rising "default rates" on loans originated in the second half of 2021 and stated that "the macro environment has become an increasing headwind to growth this past quarter, with both rising interest rates and rising consumer delinquencies putting downward pressure on conversion." Datta further revealed that, though the Company had historically used its balance sheet "almost exclusively for the purposes of [research and development]" of new loan products, such as auto lending and new segments of personal lending, in the first quarter of 2022, Upstart funded loans using its own balance sheet as "a market-clearing mechanism" to support the Company's loan transaction volume and stabilize its business.

109.    On the May 9, 2022 earnings call, Defendant Datta also reported that the Company had recently "loosened" its loan modification policy to make it easier for Upstart borrowers to

34

obtain forbearance of their loan payments. Looser forbearance standards, which effectively converts the status of some "delinquent" loans to "current," likely masked the true extent of delinquencies on Upstart-powered loans, which will likely continue to trend higher and put even more downward pressure on Upstart's conversion rate and business model.

110.    The Company also slashed its full year revenue guidance for 2022 by $150 million, from $1.4 billion to $1.25 billion, citing "macro uncertainties" and "the prospect of a recession." Further, in providing guidance for the second quarter of 2022, the Company announced a disappointing expected revenue range of $295 million to $305 million, or roughly $35 million below analysts' expectations.

111.    On this news, the Company's stock price declined by $43.52 per share, or more than 56%, from a closing price of $77.13 per share on May 9, 2022, to a closing price of $33.61 per share on May 10, 2022. Additionally, the price of Upstart's Convertible Senior Notes declined by $13.37, or approximately 18.2%, based on a comparison of the last trade price on May 9, 2022 before the Company's disclosures and the last trade price on May 10, 2022.

112.    Analysts reacted harshly to the negative news. On May 10, 2022, during an interview with Defendant Girouard, CNBC's Jim Cramer stated that he was "shocked at the . . . potentially bad loans on [Upstart's] balance sheet," describing it as "certainly ill-advised to have that many loans on [the Company's] balance sheet" and explaining that "a lot of the bankers tell me it was because [Upstart] couldn't get rid of them."

113.    A May 10, 2022, report by Wedbush Securities noted that "[w]hile the Company claims that its decision to keep more loans on-balance sheet was used as a market clearing mechanism due to interest rate moves, we see this as a divergence from its capital- light business model and could indicate [Upstart] has few alternatives other than to hold more loans due to

funding issues."

114.    In a subsequent report issued on May 13, 2022, Wedbush Securities further noted that Upstart had adopted significant changes to its loan modification policy, which led to a material increase in Upstart's loan modifications from March to April 2022, and "these increases in loan modifications could be enough to avoid tripping early triggers in the near term since delinquent borrowers who opt-in to the loan modification program are reclassified to 'current' status."

115.    Then on July 7, 2022, the Company announced its preliminary unaudited financial results for the second quarter of 2022, revealing that its revenue was expected to be approximately $228 million, a significant decreased from the previously estimated $295 to $305 million. Defendant Girouard stated that:

> Our revenue was negatively impacted by two factors approximately equally. First, our marketplace is funding constrained, largely driven by concerns about the macroeconomy among lenders and capital market participants. Second, in Q2, we took action to convert loans on our balance sheet into cash, which, given the quickly increasing rate environment, negatively impacted our revenue.

116.    On this news, the Company's stock price decreased $6.65 per share, or approximately 20%, to close at $27.09 per share on July 8, 2022.

117.    The truth was fully revealed on November 8, 2022, when the Company announced its financial results for the third quarter of 2022, revealing that total revenue was $157 million, a decrease of 31% from the third quarter of 2021. Defendant Datta stated that Upstart-originated loans were experiencing 25% more losses than modeled, essentially admitting that the Company's AI model was not performing well in the same macroeconomic environment that the Company previously told investors that the model was designed to perform.

118.    On this news, the Company's stock price dropped $1.98 per share, or approximately 10%, to close at $17.06 per share on November 9, 2022.

***Insider Sales***

119.   Significantly, during the Relevant Period, six of the Individual Defendants sold Company stock at artificially inflated prices while in possession of material non-public Company information. These sales are detailed below as follows:

    a.   On November 19, 2021, Defendant Cassidy sold 5,000 shares of the Company's stock for proceeds of over $1.05 million.

    b.   On November 11, 2021, Defendant Terry sold 60,000 shares of the Company's stock for proceeds of over $16.06 million.

    c.   On November 15, 2021, Defendant Hentges sold 30,000 shares of the Company's stock for proceeds of over $7.37 million.

    d.   Between August 2021 and March 2022, Defendant Girouard, directly and through the Girouard Revocable Trust, sold over 1.15 million shares of the Company's stock for proceeds of over $207.59 million.

    e.   Between August 2021 and March 2022, Defendant Gu sold 506,000 shares of the Company's stock for proceeds of over $143.63 million.

    f.   On August 19, 2021, Defendant Counselman sold 608,355 shares of the Company's stock for proceeds of over $122 million.

***The Securities Class Action***

120.   On July 26, 2022, the Securities Class Action was filed against the Company and Defendants Girouard, Datta, Gu, and Counselman (the "Securities Defendants"), as well as others, alleging violations of the Exchange Act. On December 5, 2022, an amended consolidated complaint was filed in the Securities Class Action (ECF No. 45) (the "Securities Action Consolidated Complaint").

121. On September 29, 2023, the court in the Securities Class Action entered the Securities Class Action MTD Order, denying the Securities Defendants' motion to dismiss in part.

122. The court in the Securities Class Action found, among other things, that certain of the Securities Defendants' statements about the superiority of the Company's AI model over traditional FICO-based models and statements that the AI model could respond dynamically to macroeconomic changes were actionable material misstatements under Rule 10b-5. Securities Class Action MTD Order at 23-29. The court also held that these same statements, collectively with other allegations in the Securities Action Consolidated Complaint, met the requirement of scienter. *Id.* at 48.

123. As such, the court held that "Plaintiffs have made a sufficient threshold showing to warrant discovery and should be permitted to test their inferences against a more developed fact record" for the above-mentioned categories of statements. *Id.*

124. The Securities Class Action is still pending.

125. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending and potentially paying class wide liability in the Securities Action. These damages also include the costs of remediating deficiencies in the Company's internal controls, compensation and benefits paid to the Individual Defendants, who breached their duties to Upstart, and reputational harm and loss of goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

126. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

127. Upstart is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

128. Plaintiffs are current shareholders of Upstart and were continuous shareholders of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

129. At the time this action was commenced, the eight Director Defendants comprised the Upstart Board. Accordingly, Plaintiffs are only required to show that four directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's eight current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

130. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

131. The Director Defendants either knowingly or recklessly issued or caused the

Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

132.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Upstart, the Director Defendants knew, or should have known, the material facts surrounding credit risk issues and the accuracy of the Company's public reporting.

133.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

134.    Additional reasons that demand on Defendant Huber is futile follow. Defendant Huber has served as a Company director since June 2021. He also serves as a member of the Nominating and Corporate Governance Committee. In addition, Defendant Huber solicited the 2022 Proxy Statement, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Huber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore,

excused.

135.     Additional reasons that demand on Defendant Cooper is futile follow. Defendant Cooper has served as a Company director since March 2021. She also serves as the Chair of the Compensation Committee. Furthermore, the 2022 Proxy Statement, which contained false and misleading statements, was solicited on her behalf. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Cooper breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

136.     Additional reasons that demand on Defendant Cassidy is futile follow. Defendant Cassidy has served as a Company director since February 2020. She also serves as a member of the Compensation Committee. Defendant Cassidy has received and continues to receive significant compensation for her role as a director as described herein. She benefited from the 2022 Proxy Statement, containing false and misleading statements, which led to her reelection to the Board and allowed her to breach her fiduciary duties to the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Cassidy engaged in insider trading, selling 5,000 shares of Upstart common stock for proceeds in excess of $1.05 million while the share price of Upstart's common stock was artificially inflated. For these reasons, Defendant Cassidy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore,

excused.

137.     Additional reasons that demand on Defendant Terry is futile follow. Defendant Terry has served as a Company director since February 2019. He also serves as the Chair of the Audit Committee. Defendant Terry has received and continues to receive significant compensation for his role as a director as described herein. Furthermore, the 2022 Proxy Statement, which contained false and misleading statements, was solicited on his behalf. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Terry engaged in insider trading, selling 60,000 shares of Upstart common stock for proceeds in excess of $16.06 million while the share price of Upstart's common stock was artificially inflated. For these reasons, Defendant Terry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.     Additional reasons that demand on Defendant Hentges is futile follow. Defendant Hentges has served as a Company director since December 2019. She also serves as a member of the Audit Committee. Defendant Hentges has received and continues to receive significant compensation for her role as a director as described herein. Furthermore, the 2022 Proxy Statement, which contained false and misleading statements, was solicited on her behalf. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Hentges engaged in insider trading, selling 30,000 shares of Upstart

common stock for proceeds in excess of $7.37 million while the share price of Upstart's common stock was artificially inflated. For these reasons, Defendant Hentges breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139. Additional reasons that demand on Defendant O'Kelly is futile follow. Defendant O'Kelly has served as a Company director since April 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant O'Kelly has received and continues to receive significant compensation for his role as a director as described herein. Furthermore, the 2022 Proxy Statement, which contained false and misleading statements, was solicited on his behalf. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant O'Kelly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140. Additional reasons that demand on Defendant Girouard is futile follow. Defendant Girouard is a co-founder of Upstart, having served as the CEO since the Company began. Defendant Girouard has received and continues to receive significant compensation for his role as a director as described herein. As a trusted Company officer, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Girouard engaged in insider trading, selling 1.15 million shares of Upstart common stock for proceeds in excess of $207.6 million while

the share price of Upstart's common stock was artificially inflated. Moreover, Defendant Girouard

is also a defendant in the Securities Class Action. For these reasons, Defendant Girouard breached

his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested,

and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Gu is futile follow. Defendant Gu is

a co-founder of Upstart, is currently the Company's Senior Vice President of Product and Data

Science and has served as a Company director since April 2015. Defendant Gu has received and

continues to receive significant compensation for his role as a director as described herein. He

benefited from the 2022 Proxy Statement, containing false and misleading statements, which led

to his election to the Board and allowed him to breach his fiduciary duties to the Company. As a

trusted Company officer and director, he conducted little, if any, oversight of the scheme to make

false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect

corporate assets. In addition, Defendant Gu engaged in insider trading, selling 506,000 shares of

Upstart common stock for proceeds in excess of $143.63 million while the share price of Upstart's

common stock was artificially inflated. For these reasons, Defendant Gu breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus

demand upon him is futile and, therefore, excused.

142.    Defendants Terry, Hentges, and O'Kelly are not disinterested or independent, and

therefore, are incapable of considering a demand because they serve as members of the Audit

Committee and, pursuant to the Audit Committee Charter, were specifically charged with the

responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*,

credit risk issues and public disclosure requirements.   Throughout the relevant time period,

however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding credit risk issues and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Terry, Hentges, and O'Kelly cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

143.    Notably, Defendants Cassidy, Hentges, Terry, Girouard, and Gu sold large amounts of Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein, and while in possession of material non-public Company information.

144.    Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Upstart stock and stock options they held.

145.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics. The Director Defendants violated the Code of Ethics because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

146.    Furthermore, demand in this case is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each

other, precluding the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director Defendants would be futile.

147. Significantly, the Director Defendants have not taken remedial action to redress the conduct alleged herein.

148. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

149. The acts complained of herein constitute violations of fiduciary duties owed by Upstart's officers and directors, and these acts are incapable of ratification.

150. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Upstart. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Upstart, there would be no

directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

151. If there is no directors' and officers' liability insurance, then the directors will not cause Upstart to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

152. Thus, for all of the reasons set forth above, all of the directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## <u>COUNT I</u>

**Against Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu
for Violations of Section 14(a) of the Exchange Act**

153. Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

155. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

156. Under the direction and watch of the Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu, the 2022 Proxy Statement failed to disclose, *inter alia*: (1) contrary to the 2022 Proxy Statement's description of Upstart's Audit Committee's responsibilities, Upstart's Audit Committee was not adequately exercising these functions, was causing or permitting Upstart to issue false and misleading statements, and the Individual Defendants on the Board and the Audit Committee at that time were breaching their fiduciary duties; (2) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder approval of the 2022 Proxy Statement; and (3) contrary to the 2022 Proxy Statement's description regarding the risk oversight function of the Board, the Board would utterly fail in the administration of its risk oversight function, resulting in the Individual Defendants' misconduct and breach of their fiduciary duties.

157. Furthermore, under the direction of the Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu, the 2022 Proxy Statement failed to disclose, *inter alia*: (1) Upstart's AI software was incapable of considering several relevant and important factors in determining loan creditworthiness; (2) as a result, Upstart faced harmful effects on its conversion rate; (3) as a result, Upstart would increasingly rely on its balance sheet to fund loans; (4) due to the foregoing, the Individual Defendants misrepresented the Company's true capabilities in approving and executing loans; and (6) the Company failed to maintain internal controls. As a

result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

158. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including, but not limited to, the re-election of Defendants Cassidy and Gu to the Board, and allowing the Individual Defendants to receive further unjust compensation.

159. The Company was damaged as a result of Defendants Huber, Cooper, Cassidy, Terry, Hentges, O'Kelly, Girouard, and Gu's material misrepresentations and omissions in the 2022 Proxy Statement.

160. Plaintiffs on behalf of Upstart have no adequate remedy at law.

<u>**COUNT II**</u>

**Against The Individual Defendants For Violations of § 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

161. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

162. The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

163. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

164. The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Upstart common stock.

165. The Individual Defendants acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of Upstart were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

166. The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Upstart, their control over, and/or receipt and/or modification of Upstart's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Upstart, participated in the fraudulent scheme alleged herein.

167. As a result of the foregoing, the market price of Upstart common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, stockholders, including Plaintiffs, relied on the statements described above and/or the integrity of the market price of Upstart common stock in purchasing Upstart common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

168.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm. The Individual Defendants, through their violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT III

### Against The Individual Defendants For Breach Of Fiduciary Duty

169.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

170.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

171.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

172.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent

51

business judgment to protect and promote the Company's corporate interests.

173.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

174.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## **COUNT IV**

### **Against The Individual Defendants For Aiding and Abetting Breach of Fiduciary Duty**

175.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

176.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

177.    Plaintiffs on behalf of Upstart have no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Unjust Enrichment

178.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

179.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Upstart.

180.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Upstart that was tied to the performance or artificially inflated valuation of Upstart, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

181.    Furthermore, as alleged above, Defendants Cassidy, Terry, Hentges, Girouard, and Gu engaged in insider sales of Company stock while in possession of material non-public information during the period the Individual Defendants' false and misleading statements and omissions caused Upstart's stock price to trade at artificially inflated rates.

182.    Plaintiffs, as shareholders and representatives of Upstart, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

183.    Plaintiffs on behalf of Upstart has no adequate remedy at law.

## COUNT VI

### Against The Individual Defendants For Waste Of Corporate Assets

184.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

185.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

186.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (a) paying and colleting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

187.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

188.    Plaintiffs on behalf Upstart has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants for Abuse of Control

189.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

190.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Upstart, for which they are legally responsible.

191.    As a direct and proximate result of the Individual Defendants' abuse of control, Upstart has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.    Plaintiffs on behalf of Upstart have no adequate remedy at law.

## COUNT VIII

**Against the Individual Defendants for Gross Mismanagement**

193.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

194.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Upstart in a manner consistent with the operations of a publicly-held corporation.

195.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Upstart has sustained and will continue to sustain significant damages.

196.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

197.    Plaintiffs on behalf of Upstart have no adequate remedy at law.

## <u>COUNT IX</u>

**Against Defendants Girouard, Datta, Gu, and Counselman for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

198.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

199.    Defendants Girouard, Datta, Gu, and Counselman are each named as defendants in the Securities Class Action, which variously assert claims under the federal securities laws for violations of Sections 10(b) and 20(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to

Defendants Girouard, Datta, Gu, and Counselman's willful and/or reckless violations of their obligations as officers and directors of Upstart.

200.    Defendants Girouard, Datta, Gu, and Counselman, because of their positions of control and authority as officers and directors of Upstart, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Upstart, including the wrongful acts complained of herein and in the Securities Class Action.

201.    Accordingly, Defendants Girouard, Datta, Gu, and Counselman are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

202.    As such, Upstart is entitled to receive all appropriate contribution or indemnification from Defendants Girouard, Datta, Gu, and Counselman.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing the Company to take all necessary actions to reform and improve its

corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.     Awarding punitive damages;

E.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: April 24, 2024

OF COUNSEL:

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
gms@rl-legal.com
vl@rl-legal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
tbrown@thebrownlawfirm.net

**EMPLOYMENT LAW PARTNERS, LLC**

By: */s/ Stuart G. Torch*
Stuart G. Torch (0079667)
David N. Truman (0082347)
4700 Rockside Road, Suite 530
Independence, OH 44131
Telephone: (216) 382-2500
Facsimile: (216) 381-0250
stuart@employmentlawpartners.com
david@employmentlawpartners.com

**LAW OFFICES OF DANIEL R. MORDARSKI LLC**

Daniel R. Mordarski
Daniel R. Mordarski
5 East Long Street, Suite 1100
Columbus, OH 43215
Telephone: (614) 221-3200
Facsimile: (614) 221-3201
dan@mordarskilaw.com

*Attorneys for Plaintiffs*

## **VERIFICATION**

I, William OConnor, am a plaintiff in this action.  I have reviewed the allegations made in the consolidated amended shareholder derivative complaint, know the contents thereof, and authorize its filing.  As to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/12/2024

William OConnor

## **VERIFICATION**

I, Kimberly Chung, am a plaintiff in this action. I have reviewed the allegations made in the consolidated amended shareholder derivative complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/16/2024

Kimberly Chung